BEEBE ET AL., RESPONDENTS, *v.* JAMES ET AL., DEFENDANTS; JAMES, APPELLANT.

(No. 6,869.)

(Submitted January 12, 1932. Decided February 10, 1932.)

[8 Pac. (2d) 803.]

*Mr. Dean King* and *Messrs. Rockwood & Rockwood,* for Appellant, submitted a brief; *Mr. Forrest C. Rockwood* argued the cause orally.

*Mr. B. F. Maiden* and *Mr. Lloyd I. Wallace,* for Respondents, submitted a brief; *Mr. Wallace* argued the cause orally.

MR. JUSTICE GALEN delivered the opinion of the court.

This action was instituted by the plaintiffs for the purpose of rescinding a land trade made by the plaintiffs with the defendant James on July 6, 1928, by the exchange of deeds, upon grounds of alleged advantage taken of the plaintiffs by reason of the confidential relations of a physician and patient existing between the parties; fraud and misrepresentation. Grant was made a party defendant by reason of allegation to the effect that on January 5, 1929, in furtherance of a conspiracy to cheat and defraud the plaintiffs, the defendant James executed and delivered a mortgage upon the lands conveyed to him by the plaintiffs for the sum of $1,500, without consideration, and with knowledge, on Grant's part, that James had fraudulently obtained title to the lands from the plaintiffs.

The defendants filed joint answer to the plaintiffs' complaint, although admitting the land trade, and averred that the mortgage to Grant had been fully satisfied, and by way of

affirmative defense pleaded waiver and laches on the part of plaintiffs.

Issue was joined by reply, and the cause was regularly brought on for trial before the court sitting without a jury, after conclusion of which findings of fact and conclusions of law were made and filed in favor of the plaintiffs, upon which judgment was duly entered, and the defendant James has appealed therefrom.

Of the sixty-eight assignments of error made by the defendants, in our opinion, but one question is presented necessary to be considered in disposition of this appeal, viz.: Did the court err in refusing to find that the plaintiffs by their conduct waived the alleged fraudulent misrepresentations, and that they were guilty of laches?

The evidence discloses that the defendant T. J. James was, during the year 1928, engaged in the practice of his profession—that of chiropractor and optometrist—at the city of Kalispell, and that prior to the month of May in that year he was not acquainted with the plaintiffs or either of them, and had never theretofore been consulted professionally, or at all, by either of the plaintiffs. The forepart of May, 1928, the plaintiff Hubert L. Beebe consulted the defendant James in the latter's office at Kalispell, respecting the fitting of the plaintiff's eyes for glasses, but no examination of any kind was then made by the defendant James. At that time the plaintiffs owned a homestead in Lincoln county, comprising 160 acres, free of encumbrance, upon which they resided; and, on the occasion of Mr. Beebe's first visit to James' office, the latter made inquiry of him concerning where he lived and the value of his homestead. Beebe then informed James that the value of his homestead was about $2,500. From that time until July 2 or 3 following, Mr. Beebe did not again see James, at which last-mentioned time Mr. Beebe again called at James' office. On this occasion James gave him "a thorough physical examination, which he stated was as thorough as that given at Mayos." The doctor then advised Mr. Beebe that his heart was in bad condition, and that the altitude where

he was living was too high, and that he should go to a lower altitude immediately. James then told Mr. Beebe of two tracts of land which he had on the Flathead Indian Reservation, in Lake county, known as the Kramer ranches, in which he had $2,500 invested, which he offered to trade for Mr. Beebe's homestead, and in that connection stated that by Beebe making such trade his health would be greatly benefited because of a lower altitude. James represented that the altitude of his lands was somewhere around 1,500 feet lower than the Beebe homestead, which he said would be sufficient, and that a trade of lands would not only be of benefit to Mr. Beebe's health but also prove financially profitable to him. James said that the Kramer ranches were worth about $8,000; that there was a mortgage upon them to the Federal Land Bank in the sum of $3,200, and, as such bank did not loan on a basis of more than thirty or forty per cent. of the value of land to be mortgaged, he figured these lands were worth at least $8,000, and that they would produce sixty bushels of wheat to the acre. James gave Beebe some pictures of the Kramer ranches, and it was agreed that Beebe should return to his home in Lincoln county and come back with his wife about July 5, at which time James would arrange to have him inspect the Kramer ranches. On the 5th of July the plaintiff Beebe returned to Kalispell, accompanied by his wife, and again went to James' office, where he was given a second eye examination. On this occasion Beebe brought with him the patent to his homestead and other papers pertaining to the Lincoln county land to show James, and he and his wife stayed at the James' residence. The next morning, July 6, both Mr. and Mrs. Beebe were examined by James, who then told Beebe and his wife that Mr. Beebe's heart was in bad condition, and that he would not live to exceed three or four years if he continued to reside on his homestead in Lincoln county, and to Mrs. Beebe, out of the hearing of her husband, he stated: "I tell you, I will give you his condition as near as I can. I will tell you, Mrs. Beebe, that little man of yours won't last six months unless you get out of this altitude—

no, I will wager he will not last three.'' On the afternoon of July 6 the defendant James took the plaintiffs in his automobile out to inspect the Kramer ranches, and on the trip they were accompanied by the Reverend W. H. Sandy, a minister of the Central Christian Church at Kalispell. James pointed out to the plaintiffs one 160-acre tract of land known as the Kramer home ranch, and the plaintiffs then walked over it and made examination of it, and later James drove them to a high spot on the road and pointed out the other 160-acre tract lying near Garcon Gulch, explaining about water thereon obtainable from a spring, but they did not actually go to the second tract, as the plaintiffs seemed satisfied, and all were in a hurry to return to Kalispell. Later the plaintiffs discovered that there was no spring or water on the Garcon Gulch land. The plaintiffs again stayed at James' residence that night, and the next morning the trade was consummated by an exchange of deeds, although at that time James had never seen the Beebe homestead. The plaintiffs executed and delivered to James a warranty deed, and James executed and delivered to them a quitclaim deed to the Kramer ranches, subject to the payment of taxes for the year 1928 and the Federal Land Bank mortgage of $3,200, as to which the deed recites that Beebe has assumed and agreed to pay the same. At that time James' title to the Kramer ranches consisted merely of a sheriff's certificate of sale of the property on execution, subject to the Federal Land Bank mortgage, issued upon execution sale in an action brought by James against one A. J. Kissick, for which James paid the sum of $135, the lands being then subject to redemption by Kissick for the amount paid by James for the property, with interest and costs. The deeds were left with James, and later he had them recorded, the deed to Beebe being recorded on July 12 and the one from Beebe to James on July 11.

Both Mr. and Mrs. Beebe testified that they reposed every confidence in James at the time of the trade, and did not discover that he was guilty of fraud and misrepresentation until they were engaged in moving to the Kramer ranches to live,

about July 13, 1928. Mr. Beebe stated that on July 12 or 13 he visited Dr. Cockrell, in Kalispell, was examined by him, and then found that his heart was absolutely normal. On July 15, 1928, Kissick executed a grant, bargain and sale deed to the Kramer ranches to James, thus divesting himself of his equity of redemption, and rendering James' claim of title to the Kramer ranches good. The plaintiffs, however, never requested any deed from James to the Kramer ranches other than the quitclaim deed which he executed on July 6, the day of the land trade, and during the trial James tendered to the plaintiffs a warranty deed to the Kramer ranches, which was refused.

On July 13 James visited the Lincoln county lands for the first time, accompanied by the plaintiffs and Dr. Grace French. On that occasion Mrs. Beebe appeared to be dissatisfied with the deal, and requested James to trade back. She was so vehement in her language in connection with the transaction that subsequently, on July 17, Mr. Beebe wrote a letter to James wherein, among other things, he said: ''Dear Doctor I know you were terribly hurt the other night and I am sure sorry, but the dear girl was just beside herself with grief at leaving the old place, and the obsession that we are going to lose everything; so please allow for that for my sake until we can prove to her that you are indeed our friend. * * * Please bear with us until Pansy gets to feeling different. She can't throw off the influence of things she has heard. * * * Since writing the above, have had a talk with Pansy and I think she feels much better.''

The plaintiffs were busily engaged in moving from their homestead to the Kramer ranches during the latter part of July, and on July 29 were completely moved, and thereafter resided upon the Kramer home ranch until September 18, made repairs on the house thereon, and, as stated, found that there was no spring or other water on the Garcon Gulch tract of land. Some time in the month of September, Mr. Beebe wrote and asked his brother, R. R. Beebe, who was then in Okanogan, Washington, to come to Montana and live on the

Kramer ranches. R. R. Beebe and his wife, Julia A. Beebe, in consequence, came to Montana and moved upon and took possession of the Kramer ranches the last Sunday in October (October 28, 1928), intending to make the place their home, and resided there until November 2, 1929, when they moved away. When they moved to the Kramer ranches, the plaintiff Hubert Beebe promised his brother and his wife that he (Hubert Beebe) would make some arrangements to stock the ranches and secure machinery with which to work the place. R. R. Beebe was charged no rent for occupancy of the lands. At the time the plaintiffs went away from the Kramer ranches they left there a cow and some personal effects for the use of R. R. Beebe, and the cow was kept and milked by the latter and his wife until it was sold by Hubert Beebe.

About August 26, 1928, the plaintiff Hubert Beebe and his mother, Mrs. D. E. Newly, called on James at his office in Kalispell, and requested him to trade back, for the reason assigned that Mrs. Beebe was very much dissatisfied with the trade, and they entertained fear that, unless a trade back could be arranged, she would lose her mind. At that time Mr. Beebe offered to give James a deed back for the Kramer ranches, and demanded from him the execution of a deed back to Mr. Beebe of the Lincoln county lands. James stated that the only condition upon which he would deed back the Lincoln county ranch would be upon payment of the sum of $1,500. Both of the plaintiffs assert that they have at all times since July 13, 1928, been and are now, willing and offer to deed back the Kramer ranches in exchange for a deed to their homestead in Lincoln county. Between the date James got possession of the Lincoln county lands July 13, 1928, and the time of the commencement of this action, about June 1, 1929, he had spent by way of improvements on such lands between $700 and $800, besides his own labor.

On November 30, 1928, the plaintiffs paid the first half of the taxes due on the Kramer ranches. On January 3, 1929, James wrote a letter to Mr. Beebe, demanding that he make payment of the installment due on the Federal Land Bank

mortgage, and on January 11 Mr. Beebe wrote on the bottom of James' letter: "We will attend to this matter," and mailed same to James. On March 5, 1929, Dean King, as James' attorney, wrote a letter to Mr. Beebe demanding payment of the installment due on the Federal Land Bank mortgage, to which Mr. Beebe replied on March 12, 1929, saying he would try, if possible, to be in Kalispell before the 15th.

The court found that each and every material allegation of the plaintiff's amended complaint had been fully established by the testimony; that they discovered the fraud perpetrated upon them on or about July 13, 1928, and elected to rescind the contract whereby the exchange of the lands was made, on or about August 25, 1928. As a conclusion of law it was determined that the deed to the Lincoln county lands was by the defendant James procured of the plaintiffs by fraud, and that the plaintiffs are entitled to have the deed thereto set aside as null and void.

The court wholly failed to make any findings whatsoever upon the affirmative defenses pleaded by the defendants, of waiver and laches, although requested so to do, for which refusal the defendants duly excepted.

The statute provides: "Rescission, when not effected by consent, can be accomplished only by the use on the part of the party rescinding, of reasonable diligence to comply with the following rules: 1. He must rescind promptly, upon discovering the facts which entitle him to rescind, if he is free from duress, menace, undue influence, or disability, and is aware of his right to rescind; and, 2. He must restore to the other party everything of value which he has received from him under the contract, or must offer to restore the same, upon condition that such party shall do likewise, unless the latter is unable or positively refuses to do so." (Sec. 7567, Rev. Codes 1921.)

Under the terms of this statute, a contract must be promptly rescinded upon discovery of fraud, or it will be regarded as having been ratified (*Advance-Rumely Co.* v. *Wenholz*, 80 Mont. 82, 258 Pac. 1085; *McConnell* v. *Blackley*, 66 Mont. 510, 214 Pac. 64; *Ott* v. *Pace*, 43 Mont. 82, 115 Pac. 37), and,

where, after discovery of a fraud entitling a party to rescind, he continues thereafter to use and treat the property as his own, or does other acts inconsistent with his right to rescind, he will be held to have elected to have ratified the contract and waived his right to rescind. (*Advance-Rumely Co.* v. *Wenholz,* supra.) ''Acquiescence in error takes away the right of objecting to it.'' (Sec. 8745, Rev. Codes 1921.) The plaintiffs had a right of election to rescind or to affirm the contract and sue for damages because of the fraud, but they could not pursue both remedies. (*Friedrichsen* v. *Cobb,* 84 Mont. 238, 275 Pac. 267.)

''A contract induced by fraud, false representations, deceit, mistake, duress or undue influence, or, generally, which is rescindable for any legally sufficient cause, is not, as a rule, void, but is voidable. If the injured party chooses to abide by it, there is nothing to prevent him from doing so, and in that case the other party will be legally bound to fulfill the contract. On the other hand, if the injured party chooses to rescind the contract, he has the right to do so, and the contract will be thereby abrogated for all purposes. He is therefore put to his election either to rescind the contract or to affirm it. Thus, where one discovers that he has been defrauded, he may choose to abide by the contract and retain what he has received under it, as being on the whole advantageous to him, which amounts to a waiver of the fraud, and he may also, by his conduct or express declarations, waive any right to compensation in damages for the fraud, and thereafter he will not be permitted to impeach the validity of the transaction.'' (Black on Rescission and Cancellation, 2d ed., sec. 561.)

''A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known  *  *  *  to the person accepting.'' (Sec. 7497, Rev. Codes 1921.) Where, after discovery of a fraud, breach of warranty, or inability of the other party to perform in full, entitling a party to a land exchange to rescind, such party uses and deals with the property received

by him as his own or does other acts inconsistent with his right to rescind, he thereby waives such right. And, where an absolute right to rescind is shown, it may be lost in consequence of conduct inconsistent therewith. (23 C. J., pp. 217, 218.)

In *Grymes* v. *Sanders*, 93 U. S. 55, 62, 23 L. Ed. 798, the rule is thus succinctly stated: "Where a party desires to rescind upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose, and adhere to it. If he be silent, and continue to treat the property as his own, he will be held to have waived the objection, and will be conclusively bound by the contract, as if the mistake or fraud had not occurred. He is not permitted to play fast and loose. Delay and vacillation are fatal to the right which had before subsisted." (See, also, *Ott* v. *Pace*, supra.)

In the case now before us, it appears that the plaintiffs remained in possession of the Kramer ranches for a period of nearly fourteen months after giving their alleged notice of rescission on August 26, 1928, and for a period of about six months after this action was begun. Here, like unto the case of *Smith* v. *Christe*, 60 Mont. 604, 201 Pac. 1011, the claim of the plaintiffs of a right of rescission because of alleged fraud was waived by reason of their conduct in retaining possession of the Kramer ranches, exercising acts of ownership over them and retaining the benefits of such possession (see, also, *Fontaine* v. *Lyng*, 61 Mont. 590, 202 Pac. 1112), unless a different principle is applicable in consequence of the relationship of the parties at the time of the trade.

As to the confidential relation existing between the defendant and the plaintiffs at the time of the land trade —that of doctor and patient—the rule is that, when such relation exists, it is the duty of the person in whom the confidence is reposed to exercise the utmost good faith in the transaction, and to refrain from abusing confidence by obtaining any advantage to himself to the detriment of the confiding parties. (12 R. C. L. 233.) However, by subsequent actions of the parties defrauded, after discovery of alleged fraud

upon them by a person occupying such confidential relation, a waiver may result as in other cases of fraud. While the existence of the confidential relation of doctor and patient at the time of the transaction may raise a presumption of constructive fraud, yet it is incumbent upon the person defrauded promptly to rescind upon discovery of the facts entitling him to rescind. After such discovery, he may by his dealings with the party who perpetrated the fraud upon him, or by his acquiescence or acts, waive the fraud, and, thereby confirm the contract as in other cases of fraud.

Since fraud in the inducement of a contract does not make it void, but only voidable (*Turk* v. *Rudman*, 42 Mont. 1, 111 Pac. 739), it was within the power of the plaintiffs to rescind or to treat the contract as valid (*Ott* v. *Pace*, supra; *Friedrichsen* v. *Cobb*, supra). By continuing in possession of the property from July 13, 1928, to November 2, 1929, through themselves and the brother of Hubert Beebe who was by him placed in possession of the lands; the payment by Hubert Beebe on November 30, 1928, of the first installment of taxes assessed on the property for 1928, and assurance made to defendant James in a letter written as late as January 3, 1929, that he "would attend to the matter" of payment of the amount due on the mortgage, an affirmance of the contract was brought about. This constituted a bar to rescission. (*Ott* v. *Pace*, supra.) These facts bring the case within the decisions of *Turk* v. *Rudman*, supra, *Ott* v. *Pace*, supra, and *Hills* v. *Johnson*, 52 Mont. 65, 156 Pac. 122, and preclude recovery.

The judgment is reversed and the cause remanded to the district court of Lincoln county, with direction to enter judgment in favor of the defendant James.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES FORD, ANGSTMAN and MATTHEWS concur.